MARC P. BERGER
REGIONAL DIRECTOR
Sanjay Wadhwa
Sandeep Satwalekar
David Stoelting
Tuongvy T. Le
Attorneys for Plaintiff
U.S. SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281-1022
Phone:  (212) 336-0174 (Stoelting)
Email: stoeltingd@sec.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | 20-CV-_____ ( ) |
| -against- | **COMPLAINT** |
| ROSS BARISH, | |
| Defendant. | **Jury Trial Demanded** |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against defendant Ross Barish ("Barish" or the "Defendant"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1. Barish, a broker at Joseph Stone Capital, LLC ("JSC"), defrauded sixteen retail customers by executing a high-cost, in-and-out pattern of trading that lost these customers over $800,000 while generating commissions and fees for him of more than $400,000. Although Barish told customers that he was an experienced broker, Barish did nothing more than buy

stocks and sell them after a brief holding period. His "strategy" amounted to a scheme to enrich himself while persuading customers that profits were just around the corner. Barish's conduct in relation to these sixteen customers, whose accounts were active during different periods of time between 2013 and July 2019, violated the antifraud provisions of the federal securities laws in four respects.

2. *First*, Barish had a duty to have a reasonable basis for recommendations that he made to his customers. In violation of this duty, Barish recommended to sixteen customers a high cost, in-and-out trading strategy without any reasonable basis to believe that these recommendations were suitable for anyone. The recommended trading strategy resulted in losses for the customers and ill-gotten gains for Barish. Barish knew or recklessly disregarded that his recommendations, for which he had no reasonable basis, were not suitable for anyone.

3. *Second*, Barish's recommended trading strategy was unsuitable for his customers in light of those customers' financial needs, investment objectives and circumstances.

4. *Third*, Barish made material misrepresentations to and omitted material information from his customers. By making a recommendation to purchase or sell a security to a customer, Barish implicitly represented that he had a reasonable basis for that recommendation. As Barish failed to have a reasonable basis for his recommendations to the sixteen customers, these recommendations constituted misrepresentations. In addition, Barish's upbeat and optimistic statements to customers constituted misrepresentations because Barish knew that the excessive costs which accumulated from the frequent trading made even a minimal profit all but impossible.

5. *Finally*, Barish engaged in unauthorized trading by placing trades in customer accounts without obtaining their authorization to do so.

6. As a result of these violations, Barish received more than $400,000 in commissions and fees. The sixteen customers experienced total losses of $814,509.

## VIOLATIONS

7. By virtue of the conduct alleged herein, the Defendant, directly or indirectly, singly or in concert, violated and is otherwise liable for violations of Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

8. Unless the Defendant is permanently restrained and enjoined, he will again engage in the acts, practices, transactions, and courses of business set forth in this complaint and in acts, practices, transactions, and courses of business of similar type and object.

## JURISDICTION AND VENUE

9. The Commission brings this action pursuant to authority conferred by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], seeking a final judgment: (1) restraining and permanently enjoining the Defendant from engaging in the acts, practices and courses of business alleged against him herein; (b) ordering the Defendant to disgorge all ill-gotten gains and to pay prejudgment interest on those amounts; and (c) imposing civil money penalties on the Defendant pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]. The Defendant, either directly or

indirectly, has made use of the means or instrumentalities of interstate commerce, of the mails, the facilities of national securities exchanges, and/or the means or instruments of transportation or communication in interstate commerce in connection with the acts, practices, and courses of business alleged herein.

11. Venue lies in the Southern District of New York pursuant to 28 U.S.C. §1391(b)(2), Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this complaint occurred within the Southern District of New York, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails, or the facilities of a national securities exchange, in that certain of the trades recommended by Barish to his customers were executed on the New York Stock Exchange based in New York, New York, and JSC maintains an office in New York, New York.

## **DEFENDANT**

12. **Barish**, age 45, is a resident of Port Washington, New York. From 1999 through early 2013, Barish was registered with six different broker-dealers. He joined JSC in May 2013 and he continues to work there as a registered representative. In June 2016, the Montana Commissioner of Securities and Insurance ("Montana CSI") instituted an administrative action alleging, among other things, that Barish and two other JSC brokers churned four customer accounts and that JSC failed to supervise them. In April 2017, JSC, Barish and the other brokers settled the Montana CSI action by entering into a Consent Agreement requiring JSC to pay restitution to the four customers, including Barish's customer. In 2017, two of Barish's customers filed arbitrations against Barish with the Financial Industry Regulatory Authority

(FINRA) alleging, among other things, excessive trading and unsuitability. Both arbitrations settled with monetary payments to the customers. Barish holds Series 7 and 63 licenses.

## RELATED ENTITY

13. **JSC,** a Delaware limited liability company formed in 2011 and headquartered in Mineola, New York, has been a registered broker-dealer since February 23, 2013. In November 2019, JSC consented to permanently cease and desist from violations of the registration provisions of the Massachusetts securities laws, and to pay a fine of $17,500 and $750 in registration fees. In August 2019, a FINRA Arbitration Panel Award ordered JSC to pay $10,000 in compensatory damages to a customer who had alleged, among other things, failure to supervise. In April 2019, a FINRA Arbitration Panel ordered JSC to pay a customer $40,831 in compensatory damages, $27,500 in claimant's attorney fees, and $6,362 in costs, following a hearing on the customer's allegations that a broker employed by JSC "excessively traded and leveraged the Claimant's account on margin, which was unsuitable and designed to generate high commissions and fees at Claimant's expense." In 2016, the Montana CSI charged JSC with failing to supervise Barish and two other brokers; this action settled in 2017 (*see supra* ¶ 12).

## FACTS

I.  **Overview of Barish's Fraudulent Scheme**

14. Since becoming a registered representative more than twenty years ago, Barish's primary business-generating technique has been cold calling strangers. Barish obtains leads by purchasing marketing databases, and his cold-calling canvasses the country. Barish is registered in nearly all states to allow for nationwide prospecting.

15. In his initial phone calls, Barish's pitch to potential customers emphasized his supposed investing expertise, successful track record and ability to identify an "earnings play."

Once a customer account had been opened, however, Barish recommended and implemented the same strategy of short-term trading using borrowed funds combined with high commissions and other costs.

16. From the inception of each of the sixteen accounts through the closing of the account or July 31, 2019 (several accounts remained active after this date), Barish's recommendations resulted in losses for the customer. *See* Attachment.

17. The customer losses were not simply an unfortunate byproduct of a speculative but potentially lucrative approach. Instead, the losses were a near-certain consequence of Barish's recommendations. The frequency of the trading, combined with the high cost structure, meant that over time the chances of earning even a minimal profit were essentially nonexistent.

18. An integral part of Barish's scheme was the use of "margin," whereby the customer purchases stock with funds borrowed from the firm with the stock serving as collateral. Borrowing money to buy stock allowed Barish to purchase much more stock than could be done by only using cash, which served Barish's interests because his compensation depended on frequent trading. The use of margin, however, increased risks and costs to the customer.

19. Barish disclosed none of these risks to his customers; instead, he touted his experience as a broker, and his knowledge of company "fundamentals." These misrepresentations, however, concealed from the customer the reality that Barish's "strategy" was doomed from the start.

II. **Barish Made Recommendations to Customers with No Reasonable Basis**

20. Barish was required to have a reasonable basis to believe that his recommendations were suitable for at least some customers. This meant that he needed to do due diligence and have an understanding of the recommendations' risks and rewards, and potential

consequences. Given that Barish recommended an in-and-out pattern of trading, he had a duty to determine whether his recommendations, which imposed high costs on the customer, were suitable and in his customers' interests.

### A. Barish's Obligations When Making Recommendations to Customers

21. As a licensed securities broker, Barish knew that he was required to abide by certain duties imposed on him by FINRA and by JSC. Most importantly, FINRA Rule 2111, which became effective in 2012, required Barish "to have a reasonable basis to believe, based on reasonable diligence, that the recommendation is suitable for at least *some* investors." (Emphasis in original.)

22. JSC's Written Supervisory Procedures ("WSPs"), which Barish was required to follow, were consistent with FINRA Rule 2111 and stated that the JSC brokers must "have a reasonable basis to believe, based on reasonable diligence, that the recommendation is suitable for at least some investors." The WSPs, like Rule 2111, also make clear that the reasonable-basis duty applies to "a recommended transaction or investment strategy."

23. In addition, in his Registered Representative Agreement with JSC, Barish agreed that he "shall adhere to all suitability requirements." In this Agreement, Barish also agreed that he "shall abide by all SEC, FINRA, and State rules and regulations pertaining to effecting securities transactions with the public."

24. JSC also conducted annual compliance meetings, which Barish was required to attend, in which the importance of brokers' reasonable basis and suitability duties were emphasized.

25. Under these well-established duties, a broker fails his reasonable basis obligation if the recommended strategy is not suitable for any customer, regardless of the customer's

investment profile. A broker cannot fulfill his suitability duties to his customers when he fails to understand the strategies he recommends.

### B. Barish's Trading Strategy Was Unsuitable for Any Customer

26. As Barish knew, or was reckless in not knowing, the investment strategy that he recommended was almost certain to lose money and, despite his duty, he had no reasonable basis for the recommendations he made. In particular, Barish had no basis to believe that the in-and-out trading that he recommended, combined with the per-trade costs and high leverage, would be suitable for anyone.

27. Barish knew all of the costs that were imposed on his customers. He unilaterally determined, on a trade-by-trade basis, the amount to charge the customer in commissions. In addition to commissions, customers were charged a per-trade "fixed commission" of $75. Additional costs imposed on the customer include margin interest and other account fees.

28. Barish's compensation was directly linked to the quantity of trades. He received $20 of each $75 fixed commission and also 75% of the total commissions.

29. Barish recommended all aspects of the trading, including the selection of issuers and the timing of purchases and sales, and the customers, based on Barish's representations, followed his recommendations.

30. Since the customers incurred costs with every transaction, making a profit depended upon the price of the security increasing during the brief period the security was held in the customer accounts. The increase in price had to exceed the combined costs for even a minimal profit to be realized. The accumulating impact of the costs over time, however, all but eliminated any possibility of even a minimal profit.

31. Through the use of margin, Barish was able to significantly increase buying

power. As shown in the Attachment, Barish's total purchases in the sixteen accounts was $47,651,466, although the average equity was only $301,636.

32. The Attachment demonstrates that the undisputed driver of the losses in the sixteen accounts was the costs associated with Barish's trading recommendations. There were approximately 3,000 total trades in the accounts and —purely on an investment basis *before* fees and costs—the accounts almost broke even with losses of $19,202. Once the total costs of $795,307 is factored in, however, the customers' total losses are pushed downward to $814,509.

33. Despite his clear duty to know and understand the impact of the cost structure on his trading strategy, Barish did virtually nothing to fulfill this duty. Instead, Barish focused his time and attention on company "fundamentals," "earning plays," and general market-related information. By ignoring the impact of costs and the frequency of trading—the single most critical factors driving the losses in the sixteen accounts—Barish acted knowingly or recklessly in violation of the federal securities laws.

34. The Attachment provides commonly used measures of account activity such as annualized turnover and cost-to-equity ratios. The annualized turnover ratio is the number of times per year a customer's securities are replaced by new securities. The cost-to-equity ratio, also referred to as the break-even ratio, measures the amount an account has to appreciate annually just to cover commissions and other expenses. A turnover of 6 or higher, or a cost-to-equity ratio in excess of 20%, is considered to be indicative of excessive trading.

35. The average annualized cost-to-equity ratio was 41.2% for the sixteen Barish accounts. In other words, due to the costs imposed on the customers, the accounts had to increase in value an average of 41.2%, on a yearly basis before the customer would see a single dollar of profit. The frequency of trading in the sixteen accounts is shown by the average

turnover rate of 24.6, which means that roughly every two weeks all of the securities in each account were replaced with new securities.

36. As these metrics indicate, the high cost and frequency of Barish's trading strategy were significant factors in the customers' losses. Indeed, in eleven of the sixteen accounts, the costs of the strategy triggered net losses in what would have otherwise been marginally profitable accounts.

37. Barish knew the amount of costs that his customers were paying. He decided the amount of commissions and knew of the $75 per-trade firm commission. Barish also had desktop access to information of the total amount of costs borne by each account on a monthly and yearly basis. Barish also knew of the importance of the turnover and cost-to-equity figures, and every few months his supervisors at JSC showed him a chart summarizing the turnover and cost-to-equity figures for his most active accounts. Nevertheless, despite access to information showing the impact of costs on the performance of the sixteen accounts, Barish did not consider their impact on the ability of the accounts to turn a profit and did not alter his trading strategy accordingly.

38. Through this fraudulent conduct, Barish intentionally or recklessly violated his duty to have a reasonable basis for his recommendation to the sixteen customers.

### III. Barish Made Unsuitable Customer-Specific Recommendations

39. If a broker has not satisfied his reasonable basis obligation with respect to an investment strategy, he cannot satisfy his customer-specific suitability obligation for those customers to whom he applied that strategy. In other words, if the strategy is not suitable for any customer—regardless of the customer's investment profile—then the strategy cannot be suitable for a particular customer.

40. As a result, even if Barish satisfied his reasonable-basis duties, Barish was also required to make customer-specific suitability determinations, which meant that he had a duty to determine that his recommendations were suitable for his customers in light of their customers' financial needs, investment objectives, risk tolerance, and circumstances.

41. Barish's trading strategy, for the reasons set forth above (*supra* ¶¶ 20-38), was not suitable for his particular customers, and was incompatible with each of these customers' financial needs, investment objectives, risk tolerance and circumstances. Certain of the sixteen customers, some of whom were retired or in their 70s, had conservative to moderate investment objectives and risk tolerances.

42. Barish had only limited and cursory discussions with his customers regarding their financial condition and needs. The account opening documents sent to the customers, moreover, were uniformly pre-populated to show "Speculation" and/or "Aggressive" as the investment profile.

43. The customers, moreover, expected a trading strategy that, even if considered "speculative," had at least some chance of turning a profit. Barish's strategy, however, could not even be considered "speculative" because of the near-absence of any chance of making even a modest profit.

44. As noted above, the use of margin to increase buying power was a critical part of Barish's one-size fits all strategy. As a result, all sixteen customers were sent margin agreements to sign regardless of whether they had ever used margin or wanted to use borrowed funds to buy stocks. Indeed, six customers indicated on their account opening forms that they wanted trading done in a cash account, not a margin account. Barish ignored this and sent them margin agreements to sign anyway to permit him to trade in a margin account.

### IV. Barish Made Material Misrepresentations to and Omitted Material Information From His Customers

45. Barish concealed material information from the sixteen customers and made material misrepresentations.

46. By making a recommendation to purchase or sell a security to a customer, Barish implicitly represented that he had a reasonable basis for that recommendation. As Barish failed to have a reasonable basis for his recommendations to the sixteen customers, his trading recommendations constituted misrepresentations.

47. In addition, Barish made material misrepresentations by falsely claiming that his recommended trading strategy had the potential for profit. Barish also omitted material facts by failing to disclose that he had no reasonable basis for his recommended trading strategy, and that the strategy virtually guaranteed that the account would lose money.

48. In his initial phone calls with customers, Barish generally touted his ability to make money for customers. Barish did not tell customers that the transaction costs associated with his recommended strategy—in the form of commissions, the $75 fixed commissions, and margin interest—would almost certainly exceed any potential gains in the accounts.

49. When Barish spoke to customers, he discussed particular issuers or market conditions. When losses inevitably occurred, Barish told the customer that his next recommendation would make up those losses. He concealed from customers, however, the most important factor in whether or not an account would be profitable over time: the negative impact of the frequency of the buys and sells, combined with the high per-trade costs, including the high commissions that Barish unilaterally imposed.

50. Barish also concealed from his customers the fact of the losses that other customers had and were experiencing from his trading recommendations. For example, the

accounts of Customers 4, 6, 13, and 14 all ceased activity during 2016 and 2017. It would have been highly material for Barish's other customers, whose accounts remained active in 2018 and 2019, to know that the same strategy that Barish was employing in their accounts had resulted in losses in the earlier accounts. Barish not only concealed this information, he regularly told customers that his other customer accounts were profitable.

51. The material information regarding the impact of costs was information that Barish had at his fingertips but the customers did not. The monthly account statements sent to customers did not disclose commissions, and the trade confirmations sent after each trade only disclosed the costs for that particular trade. Barish never told customers the total amount of costs that were accumulating over time or the devastating impact of these costs on an account's profitability. And although some customers were sent after-the-fact letters containing generalized warning of the risks of active trading, customers were not given their actual turnover and cost-to-equity numbers, information which Barish had but the customers did not.

## V. Barish Engaged in Unauthorized Trading

52. All of the sixteen accounts managed by Barish were non-discretionary; as a result, he was required to seek and obtain customer authorization before placing an order for a buy or a sell. Barish never met these customers face-to-face and his communications with them were almost entirely by telephone. Accordingly, for a trade to be properly authorized by the customer there should have been a phone call between the customer and Barish before the order was entered.

53. To speak with customers, Barish used either the phone at his desk in JSC's Mineola, New York office or his personal cell phone.

54. A comparison of phone and trading record shows that more than 45% of the

13

trades placed by Barish between January 1, 2016 and July 31, 2019 were not preceded by a phone call. Given that Barish only communicated with customer through phone calls, this evidence shows widespread unauthorized trading by Barish.

## **FIRST CLAIM FOR RELIEF**
**Violations of Section 17(a) of the Securities Act**

55. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 54, as if fully set forth herein.

56. The Defendant, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, knowingly or recklessly has: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or omissions of a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities and upon other persons.

57. The Defendant violated Section 17(a) of the Securities Act by, among other things, knowingly, recklessly or negligently making recommendations to customers with no reasonable basis to believe his recommendations were suitable for anyone; making recommendations to customers with no reasonable basis to believe his recommendations were suitable for his particular customers; making material misrepresentations to customers and omitting material information; and engaging in unauthorized trading.

58. By reason of the foregoing, the Defendant, directly or indirectly, singly or in concert, has violated, and unless enjoined, will again violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5

59. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 54, as if fully set forth herein.

60. The Defendant, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, knowingly or recklessly has: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

61. The Defendant violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by, among other things, knowingly or recklessly making recommendations to customers with no reasonable basis to believe his recommendations were suitable for anyone; making recommendations to customers with no reasonable basis to believe his recommendations were suitable for his particular customers; making material misrepresentations to customers and omitting material information; and engaging in unauthorized trading.

62. By reason of the foregoing, the Defendant, directly or indirectly, singly or in concert, has violated, and unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

**I.**

Permanently enjoining the Defendant from committing, aiding and abetting or otherwise engaging in conduct that would make him liable for the violations of the federal securities laws alleged in this complaint.

**II.**

Ordering the Defendant to disgorge any ill-gotten gains and to pay prejudgment interest on those amounts.

**III.**

Ordering the Defendant to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**IV.**

Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Dated: New York, New York
August 13, 2020

Respectfully submitted,

By:   /s/ Marc P. Berger
      Marc P. Berger
      Sanjay Wadhwa
      Sandeep Satwalekar
      David Stoelting
      Tuongvy T. Le
      *Attorneys for Plaintiff*
      U.S. Securities and Exchange Commission
      New York Regional Office
      200 Vesey Street, Suite 400
      New York, New York 10281-1022
      Tel: (212) 336-0174 (Stoelting)
      Email: stoeltingd@sec.gov

**ATTACHMENT**

| Customer | Annual Cost / Equity Ratio | Annualized Turnover | Average Equity[1] | Total Purchases | Total Costs | Total Loss | Weighted Days Held[2] | Account Period Beginning | End |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 122.7% | 62.3 | $23,411 | $599,540 | $11,808 | $(10,922) | 11.8 | 10/01/16 | 02/28/17 |
| 2 | 64.1% | 38.5 | 28,276 | 3,172,095 | 52,807 | (35,616) | 15.4 | 09/01/16 | 07/31/19 |
| 3 | 47.6% | 19.7 | 22,124 | 1,414,148 | 34,183 | (9,159) | 26.5 | 05/01/16 | 07/31/19 |
| 4 | 67.1% | 29.8 | 20,533 | 2,040,753 | 45,958 | (35,100) | 19.8 | 06/01/13 | 09/30/16 |
| 5 | 56.8% | 31.5 | 42,963 | 4,396,202 | 79,259 | (28,886) | 16.3 | 05/01/16 | 07/31/19 |
| 6 | 38.3% | 20.2 | 40,507 | 1,365,676 | 25,854 | (60,266) | 20.8 | 10/01/14 | 05/31/16 |
| 7 | 51.5% | 35.4 | 76,259 | 9,210,421 | 134,084 | (94,771) | 15.4 | 03/01/16 | 07/31/19 |
| 8 | 22.2% | 11.8 | 68,449 | 2,624,851 | 49,520 | (108,112) | 30.5 | 03/01/13 | 05/31/16 |
| 9 | 48.3% | 27.6 | 64,275 | 2,514,739 | 43,973 | (10,397) | 23.0 | 03/01/18 | 07/31/19 |
| 10 | 47.8% | 27.1 | 35,860 | 1,941,605 | 34,206 | (46,182) | 28.2 | 08/01/17 | 07/31/19 |
| 11 | 11.8% | 9.9 | 92,859 | 4,381,999 | 52,302 | (199,790) | 53.9 | 03/01/13 | 11/30/17 |
| 12 | 31.7% | 22.7 | 103,734 | 6,057,746 | 84,785 | (17,159) | 25.9 | 01/01/17 | 07/31/19 |
| 13 | 47.9% | 23.5 | 30,819 | 1,328,164 | 27,048 | (28,342) | 30.9 | 07/01/14 | 04/30/16 |
| 14 | 33.1% | 17.2 | 16,806 | 576,468 | 11,140 | (41,488) | 49.3 | 02/01/15 | 01/31/17 |
| 15 | 80.0% | 28.8 | 8,247 | 219,016 | 6,072 | (6,953) | 22.7 | 03/01/15 | 01/31/16 |
| 16 | 77.6% | 44.0 | 33,690 | 5,808,043 | 102,310 | (81,366) | 15.1 | 09/01/15 | 07/31/19 |
| Total: | | | $301,636 | $47,651,466 | $795,307 | $(814,509) | | | |
| Average: | **41.1%** | **24.6** | | | | | 23.6 | | |

---

[1] "Average Equity" is an average of the net portfolio value amounts listed in the customers' monthly account statement.
[2] Weighted for investment size.

18